UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| DILSON JOEL GRATEROL RUIZ,<br>Petitioner,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States;<br>DAVID WESLING, Acting Boston Field Office<br>Director of Immigration and Customs Enforcement;<br>DAVID W. JOHNSTON, Director Immigration and<br>Customs Enforcement Vermont; TODD M. LYONS,<br>Acting Director U.S. Immigration and<br>Customs Enforcement; PETER R. FLORES, Acting<br>Commissioner U.S. Customs and Border Protections;<br>KRISTI NOEM, U.S. Secretary of Homeland Security;<br>MARCO RUBIO, Secretary of State; PAMELA J.<br>BONDI, U.S. Attorney General; GREG HALE,<br>Superintendent Northwest State Correctional Facility<br>Respondents. | Case No. 2:26-cv-00012 |

**OPINION AND ORDER**
(Doc. 1)

The court held a second hearing on Mr. Graterol Ruiz's Petition for Habeas Corpus on February 18, 2026. The procedural and factual background of this case are set forth in an earlier Order that was issued following the first hearing. (Doc. 16.) In that Order, the court noted the parties needed additional time to provide evidence and argument regarding two constitutional claims raised by Mr. Graterol Ruiz. (Doc. 16 at 20.) First, the court noted that additional information was needed to assess Mr. Graterol Ruiz's claim that he was receiving inadequate medical care in violation of his rights under the Fifth Amendment. (*Id.* at 18.) Second, the court

sought additional information regarding the notice provided to Mr. Graterol Ruiz of his parole termination.[1] (*Id.* at 19.)

At the hearing on February 18, 2026, Superintendent Hale presented the testimony of Dr. Jeremy Morrison. Federal respondents provided the court with evidence regarding the notice that was provided to Mr. Graterol Ruiz when his humanitarian parole was revoked.

## Findings of Fact[2]

Based on the evidence presented at the hearing, the court makes the following findings: Jeremy Morrison, a Doctor of Osteopathic Medicine, board-certified in family medicine and addiction medicine, is the assistant statewide medical director for Wellpath, the contracted health care provider for the Vermont Department of Corrections. In his role, Dr. Morrison provides direct care to incarcerated individuals and has met with Mr. Graterol Ruiz at Northwest State Correctional Facility ("Northwest"). In addition to meeting with Mr. Graterol Ruiz, Dr. Morrison reviewed Mr. Graterol Ruiz's medical records from the correctional facility. These records include documentation from Boston Medical Center, where Mr. Graterol Ruiz was receiving treatment prior to his detention.

---

[1] The Government asserts that Mr. Graterol Ruiz's Petition for Habeas Corpus does not allege a due process violation based on the revocation of his parole. This is accurate. While it may have been better practice for Petitioner's counsel to amend the Petition, the Government was on notice of this issue. In the original Petition, Mr. Graterol Ruiz's counsel indicated that he had been granted parole under a special program for individuals from Cuba, Honduras, Nicaragua, and Venezuela, which had been categorically revoked. (Doc. 1 at 2, ¶ 1, 3, ¶ 7.) The Government's response to the Petition clarified that Mr. Graterol Ruiz had been granted humanitarian parole when he arrived in the country. (Doc. 12 at 4.) In his Reply, filed on February 1, 2026, the day before the original hearing, Mr. Graterol Ruiz raised the issue of proper notice of this revocation. (Doc. 13 at 10.) In its Order dated February 6, 2026, the court indicated it was not ruling on the issue of whether notice of the parole revocation complied with procedural due process because the Government did not have sufficient time to address this prior to the hearing. (Doc. 16 at 19.) The court specifically indicated in its Order, this issue would be addressed at a subsequent hearing. The Government produced a Declaration from Customs and Border Protection regarding notification. This issue is properly before the court.

[2] Reference is made in these findings to medical records from Northwest and a Declaration of Matthew Kim. Although these documents will be filed with the court under seal, they have not yet been docketed at the time of this Order. As a result, this Order will not contain citations to the court's docket. All parties and the court have reviewed the filings.

Mr. Graterol Ruiz has chronic osteomyelitis, which is chronic infection in his bone. Mr. Graterol Ruiz was injured over two years ago in Mexico and suffered a severe fracture to his ankle. At the time of the injury, Mr. Graterol Ruiz had surgery in Mexico to insert screws and a plate to treat the fracture. After moving to Massachusetts, Mr. Graterol Ruiz became ill in 2024. Mr. Graterol Ruiz sought and received treatment at Boston Medical Center. It was determined that an infection had developed in the ankle. Mr. Graterol Ruiz underwent surgery during which the hardware was removed.

Because of bacterial growth in the area, Mr. Graterol Ruiz was placed on long-term antibiotics. When the bacteria continued to grow despite the use of antibiotics, doctors performed another surgery, cut out a portion of bone and placed a spacer in the bone. The spacer is a block that contains antibiotics. The insertion of the spacer and continued use of antibiotics did not stop bacterial growth in the area. As a result, surgeons removed the spacer and inserted another one. Mr. Graterol Ruiz continued to take an antibiotic to prevent the spread of bacteria. This is referred to as suppressive therapy and is done when doctors are unsure whether the bacteria can be eliminated, and they seek to prevent further growth. For Mr. Graterol Ruiz, the suppressive therapy involved taking the antibiotic Linezolid. This therapy was ongoing when he entered Northwest, and he continued to take this medication as of the day of the hearing.

Dr. Morrison believes another surgery will likely be needed. While there may be times when a spacer is left in the body, it is not standard. Surgery, however, will likely not occur for a number of months as additional information is gathered to assess the bacterial growth. Based on Dr. Morrison's review of medical records from Boston Medical Center, he believed there were four options that would be discussed regarding long term care of Mr. Graterol Ruiz's ankle. Three of these options involved surgery and one did not.

Dr. Morrison spoke with an infectious disease specialist at the University of Vermont Medical Center ("UVM") on February 18, 2026, the morning of the hearing. It appears this may have been the first time that a member of the medical staff at Northwest was able to communicate with UVM about Mr. Graterol Ruiz's medical condition since his arrival on or about January 14, 2026. Dr. Morrison shared the information he had regarding Mr. Graterol Ruiz's condition to the Infectious Disease Specialist. The UVM provider believed that UVM would be able to see Mr. Graterol Ruiz within "the next few weeks." The UVM doctor also advised Dr. Morrison on the antibiotic treatment and a potential switch in medication to a less dangerous antibiotic.

Dr. Morrison indicated that medical staff at Northwest would be able to monitor Mr. Graterol Ruiz' bacterial levels through regular testing. Dr. Morrison is aware that a growth in the bacterial levels could result in Mr. Graterol Ruiz losing his leg, or his life, if not treated promptly. As a result, if Mr. Graterol Ruiz notifies medical staff of increased symptoms, such as pain, fever, or decreased ability to bear weight, he would be brought to the emergency department for further testing. Dr. Morrison believed the medical staff at the Northwest would be able to care for Mr. Graterol Ruiz's chronic osteomyelitis with consultation with UVM Medical Center.

During the hearing, and through his attorney, Mr. Graterol Ruiz represented he had not taken his antibiotic over the past couple of days. The court asked the Department of Corrections to produce Mr. Graterol Ruiz's medication administration record for the past ninety-six hours to the court. The medicine administration record from February 1 to February 18, 2026 was provided to the court. This document indicates that while some medicines were not taken over the past ninety-six hours, Mr. Graterol Ruiz only missed one dose of the antibiotic. The record indicates this occurred because Mr. Graterol Ruiz did not come to the medication line.

In addition to the medication administration record, Superintendent Hale provided an affidavit from Dr. Morrison. Following the hearing, Dr. Morrison was able to speak to Mr. Graterol Ruiz's infectious disease provider at Boston Medical Center. This provider agreed that Mr. Graterol Ruiz's antibiotics could be switched or stopped altogether so long as he was monitored for symptoms. Dr. Morrison was going to follow-up with Mr. Graterol Ruiz to see what his preferred course of care would be.

At the hearing, the court was also provided with a Declaration from Matthew Kim, the Director of the Office of Information and Technology at U.S. Customs and Border Protection. The Declaration addresses the notice provided to Mr. Graterol Ruiz of the revocation of his parole. The Declaration states notice was sent to two email addresses. It is unknown where these email addresses were obtained. It is unknown whether the agency received notification that the emails were returned as undelivered or received. Mr. Graterol Ruiz stated that he did not recognize the first email, davvfer069@gmail.com, and never used it. The second email, dilsonjoel109@gmail.com, was similar to his email but was not exactly correct. Mr. Graterol Ruiz indicated his email is dilsonjoel09@gmail.com. This email is identical to the email listed on Mr. Graterol Ruiz's medical records from Boston Medical Center. Mr. Graterol Ruiz indicated he did not receive the notice attached to Mr. Kim's Declaration.

## Conclusions of Law and Analysis

### I. Conditions of Confinement

Mr. Graterol Ruiz raises a due process claim concerning the conditions of his confinement. (Doc. 1 at 16.) He alleges ICE denied him necessary medical care for his serious medical needs. (Doc. 13 at 3.) To establish a violation of the Fifth Amendment's Due Process Clause, a pre-trial detainee must show "(1) the existence of a 'serious medical need,' and (2) that Respondents acted

5

with deliberate indifference to such need." *Munoz Materano v. Arteta*, 804 F. Supp. 3d 395, 423 (S.D.N.Y. 2025) (quoting *Charles v. Orange Cnty.*, 925 F.3d 73, 85 (2d Cir. 2019)).

This court previously determined Mr. Graterol Ruiz has a serious medical need that satisfies the first prong. (Doc. 16 at 15–16.) Mr. Graterol Ruiz has an orthopedic condition that has required multiple surgeries, and he has previously suffered from infections which now require ongoing treatment with antibiotics. (*Id.* at 15.) As Dr. Morrison testified, a delay or denial in his required medical treatment could result in the amputation of his leg or loss of his life.

The court delayed ruling on the second prong because the Respondents did not have sufficient time to review or respond to the medical records, which contained a note by a medical professional at Northwest who advised Mr. Graterol Ruiz be referred back to his providers at the Boston Medical Center for care. (*Id.* at 18.) Respondents previously represented that Northwest may be unable to adequately address Mr. Graterol Ruiz's medical conditions, and ICE intended to transfer him to a facility in Miami, Florida. Counsel for Superintendent Hale had previously represented that local providers were unwilling to treat Mr. Graterol Ruiz since he had medical providers and a treatment plan at the Boston Medical Center. The court noted the absurdity of transferring Mr. Graterol Ruiz out of state—potentially causing delays in medication or treatment—when he has established medical care in Boston.

In Petitioner's Supplemental Brief, he did not raise additional arguments or present evidence concerning the conditions of his confinement. (*See* Doc. 20.) Mr. Graterol Ruiz's original argument contends the missed dosages of his antibiotics and missing an appointment with his medical team at the Boston Medical Centers rise to the level of deliberate indifference. (Doc. 13 at 3.) At the most recent hearing, Mr. Graterol Ruiz also indicated he had missed several dosages of his antibiotics over the past couple of days.

To satisfy the deliberate indifference standard, Respondents need to know that "failing to provide the complained of medical treatment would pose a substantial risk to his health" or "*should have known*" that failing to provide the treatment could have severe consequences. *Charles*, 925 F.3d at 87. Petitioner needs to show the Respondents either "acted intentionally" or "recklessly failed to act with reasonable care" to address his serious medical needs. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

The court previously determined that the first missed antibiotics was not sufficient to show deliberate indifference because his prescription had been restarted. (Doc. 16 at 17.) Additionally, Respondents confirmed they understood the importance and urgency of the medication. (*Id.*)

Similarly, the court cannot find the recently missed medication constitutes deliberate indifference by Respondents. According to the medical records provided to the court, Mr. Graterol Ruiz missed a dosage of Linezolid on the evening of February 16, 2026. (Doc. 24-1 at 9.) The records state he "[r]efused to come down/out." (*Id.*) Dr. Morrison's affidavit accompanying the medical records recounts Mr. Graterol Ruiz's statement that the language barrier "affects his understanding of the timing of medication distribution." (Doc. 24 at 2, ¶ 4.) The missed medication on February 16, 2026 cannot rise to the level of deliberate indifference by Northwest to Mr. Graterol Ruiz's serious medical needs.

The question turns to whether the missed appointment and Northwest's inability to provide him treatment constitutes deliberate indifference. Mr. Graterol Ruiz will be seen by the Infectious Disease Department at UVM within the next few weeks. In the meantime, the doctor from the Infectious Disease department advised Dr. Morrison on Mr. Graterol Ruiz's antibiotic treatment. This treatment has also been discussed with providers at Boston Medical Center. If Mr. Graterol Ruiz were to develop any symptoms suggestive of an infection, he would be transferred to an

emergency department. Dr. Morrison stated the medical staff at Northwest has been notified to address any sick calls made by Mr. Graterol Ruiz immediately.

Dr. Morrison confirmed Mr. Graterol Ruiz's surgeon from Boston Medical Center is on sabbatical, and if Mr. Graterol Ruiz needed another surgery, it may be performed by another surgeon. Although Dr. Morrison stated it is preferable to keep your medical care in one place, he had no concern about Northwest in conjunction with the UVM's ability to provide the necessary medical care for Mr. Graterol Ruiz.

It is likely Mr. Graterol Ruiz missed another appointment with the Boston Medical Center that was scheduled on February 19, 2026, and he will not be seen by the Infectious Disease Specialist with UVM for a "few weeks." Despite this, Dr. Morrison consultation with the Infectious Disease Specialist and Boston Medical Center has resulted in a plan of care to treat Mr. Graterol Ruiz. This communication with Mr. Graterol Ruiz's providers in Boston and with UVM's team indicates an intentionality for his ongoing medical care.

Courts grant prison officials "wide discretion in treating" detainees and treatment plans by medical providers are "given a 'presumption of correctness.'" *Jones v. Sherriff of Suffolk Cnty.*, 518 F. Supp. 3d 650, 657 (E.D.N.Y. 2021) (quoting *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). "Disagreements over . . . forms of treatment" do not rise to the level necessary for a Fifth Amendment Claim. *Id.* (citation modified); *see also Charles*, 925 F.3d at 87 (noting deliberate indifference requires "something more than mere negligence" (quoting *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996))). Even if Mr. Graterol Ruiz would prefer his treatment at the Boston Medical Center, the Department of Corrections has wide discretion in determining where and how he receives medical treatment.

In previous hearings, Respondents indicated a plan to transfer Mr. Graterol Ruiz to another facility out-of-state. The court expressed concerns over this plan in its previous Order. (Doc. 16 at 18.) No information has been provided to the court whether this would still be the plan when the Temporary Restraining Order expires or is lifted by this court. The court could imagine there may be a delay in treatment or care if he were to be transferred. No party provided any evidence or argument on this matter, and the court cannot find deliberate indifference on speculative and future looking concerns.

Respondents have shown their ability to care and provide treatment for the Petitioner. For the foregoing reasons, the court DENIES Mr. Graterol Ruiz's Petition to the extent it seeks relief under the Fifth Amendment's Due Process Clause concerning the conditions of his confinement.

## II.   Lack of Administrative Review and Notice

The Due Process Clause of the Fifth Amendment protects the right of "any person" from "be[ing] deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Fifth Amendment entitles noncitizens to due process of the law in removal proceedings. *See Reno v. Flores*, 507 U.S. 292, 306 (1993); *see also Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent.").

Mr. Graterol Ruiz has raised a procedural due process claim, alleging the revocation of his humanitarian parole violated his Fifth Amendment rights. (Doc. 13 at 10.) He asserts he received neither written notice of his termination nor an individualized hearing with the opportunity to be heard. (*Id.*)

Mr. Kim's Declaration states that Customs and Border Protection sent an email titled "Notice of Termination of Parole" to Mr. Graterol Ruiz on April 11, 2025. Although the

Declaration does not include a copy of the actual email purportedly sent to Mr. Graterol Ruiz, it includes the language that was used. The Notice of Termination of Parole email states "DHS is now exercising its discretion to terminate your parole." Respondents contend this written notice is sufficient to satisfy the revocation requirements articulated by the Second Circuit in *Ofosu v. McElroy*, 98 F.3d 694 (2d Cir. 1996), in 8 U.S.C. § 1182(d)(5)(A), and in C.F.R. § 212.5(e)(2)(i). Alternatively, Respondents argue notices that Mr. Graterol Ruiz subsequently received regarding revocation of his employment authorization serve as sufficient written notice to advice Petitioner his parole had been revoked.

Section 1182 provides that parole may be granted on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Parole can be granted by a DHS official who makes a determination on an individual case level that there is either an "urgent humanitarian" reason or a "significant public benefit." *Id.* The regulation implementing 8 U.S.C. § 1182(d)(5)(A) requires that "upon the accomplishment of the purpose for which parole was authorized . . . parole shall be terminated upon written notice to the alien." 8 C.F.R. § 212.5(e)(2)(i).

Respondents rely on the Second Circuit's decision in *Ofosu* to support their position that written notice is the only requirement for parole revocation. The procedural posture in *Ofosu* is different from that of the present case, rendering the Second Circuit's findings materially distinguishable from this case. The petitioner in *Ofosu* was temporarily paroled into the United States when he applied for asylum. *Ofosu*, 98 F.3d at 696. An Immigration Judge later denied the petitioner's asylum application, which he then appealed to the Board of Immigration Appeals ("BIA"). *Id.* at 697. The BIA dismissed the appeal. *Id.* The petitioner then filed a petition in district court seeking habeas relief from the BIA's order. *Id.* at 698. The district court denied the

petition. *Id.* The Immigration and Naturalization Services ("INS") and the petitioner agreed upon a "judicially approved stipulation" where the petitioner would be granted a temporary stay of deportation if he appealed the district court's denial of habeas relief and filed a motion in the Second Circuit requesting a stay of exclusion pending the disposition of the appeal. *Id.* The district court granted him the stay from deportation, but still required the petitioner to present himself for a possible revocation of parole. *Id.* The petitioner did not present himself, and instead his counsel sent multiple letters to the INS requesting written notice if his parole was being terminated and that the INS "observe all applicable regulatory procedures on this matter." *Id.* at 698–99. Counsel for INS reminded the petitioner at the hearing in front of the district court and via a written letter that he was to present himself to INS where he could make a request for continued parole. *Id.*

The Second Circuit noted that "parole is a matter of the Attorney General's discretion (and of the opinion of those she appoints) and may be ended without hearings or special forms." *Id.* at 700. The Court further stated that the notice to the noncitizen was "written and clear and reviewed by five federal judges . . . ." *Id.* By not presenting himself, the Second Circuit held that the petitioner violated his parole and that "there is simply no basis for Ofosu's insistence that the INS leap procedural hurdles to terminate parole." *Id.*

The holding in *Ofosu* does not require this court to find, in this present stage of litigation, written notice alone is sufficient to inform Mr. Graterol Ruiz his parole was terminated. Notably, the petitioner in *Ofosu* was asked to present himself to INS "for *possible* parole revocation." *Id.* at 699 (emphasis added). The notice at issue in *Ofosu* was not notice of parole termination but

11

notice that INS was considering revocation and provided the petitioner the opportunity to be heard. *Id.*

Here, Respondents contend Mr. Graterol Ruiz received written notice via email which is all that is required to terminate parole. Even if the court assumes that written notice is the only process needed to terminate humanitarian parole, the flaw in Respondent's position is the lack of evidence to suggest notice was properly sent to or received by Mr. Graterol Ruiz. Mr. Kim's Declaration provides two email addresses to which the Notice was emailed. Mr. Kim does not, however, describe how these emails are associated with Mr. Graterol Ruiz. The first email address, davvfer069@gmail.com, is not recognized by Mr. Graterol Ruiz. While the second email address is close to the email address used by Mr. Graterol Ruiz, it is not his correct email. The second email address, dilsonjoel109@gmail.com, contains a "1" that Mr. Graterol Ruiz's email address does not. Counsel for Petitioner stated that "09" represents a significant date for Mr. Graterol Ruiz. More importantly, however, the medical records from Boston Medical Center contain multiple references to an email contact for Mr. Graterol Ruiz. The email is dilsonjoel09@gmail.com, consistent with the email described by Mr. Graterol Ruiz during the hearing. Based on this, the court cannot find Respondents properly sent written notice to Mr. Graterol Ruiz or that he received such notice.

Respondents submit that notices about Mr. Graterol Ruiz's Employment Authorization can also satisfy the written notice requirement. The court disagrees with this assessment. The Notice of Intent to Revoke Employment Authorization states, "You have previously received an email from the Department of Homeland Security (DHS) giving you notice that the parole that granted you access to the United States would be terminated 7 days after the date of the notice." (*Id.* at 1.) It further states, "[t]his notice is an additional reminder that your status in the United States *will*

be unlawful *after your parole is terminated.*" (*Id.* (emphasis added)). It concludes by saying "please disregard this notice if your employment authorization document reflects any employment code other than (c)(11)." (*Id.*)

The second document, the Notice of Revocation of Parole-Based Employment Authorization, states "DHS records indicate that your parole has expired or been terminated." (Doc. 12-3 at 2.) The Notice continues that "[b]ecause your parole has expired or been terminated, your employment authorization under 8 CFR 274a.12(c)(11) is revoked. This decision has no effect on future applications, petitions, or requests you may file with the USCIS or other employment authorization granted under another section of federal regulations." (*Id.*) The Notice concludes with: "You may not appeal this decision. However, if you believe your employment authorization was revoked in error, you may file a motion to reconsider . . . ." (*Id.*)

Unlike the notices addressing Mr. Graterol Ruiz's employment authorization, the Notice of Termination of Parole email attached to Mr. Kim's Declaration, opens with, "[i]t is time for you to leave the United States." The Notice further reads: "Pursuant to 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5(e), DHS is now exercising its discretion to terminate your parole." The Notice continues, "[i]f you do not depart the United States *immediately* you will be subject to potential law enforcement actions that will result in your removal from the United States." The Notice concludes with: "Again, DHS is terminating your parole . . . Please depart the United States immediately."

The language in these two notices is remarkably different. The Notice of Termination of Parole clearly outlines parole is being terminated by the Department of Homeland Security. The Notice of Revocation of Parole-Based Employment Authorization includes language that permits a degree of ambiguity, as it could be reasonably interpreted to suggest the Notice of Revocation of

Parole-Based Employment Authorization was issued in error and that Mr. Graterol Ruiz's parole was not, in fact, terminated.

The type of "notice required will vary with circumstances and conditions." *Walker v. City of Hutchinson, Kan.*, 352 U.S. 112, 115 (1956). The Supreme Court has stated that "'when notice is a person's due . . . [t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it,'" and "assessing the adequacy of a particular form of notice requires balancing the 'interest of the State' against 'the individual interest sought to be protected'" by the Fifth Amendment. *Jones v. Flowers*, 547 U.S. 220, 229 (2006) (citation omitted) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314–15 (1950)). The Notice of Revocation of Parole-Based Employment Authorization does not satisfy the written notice requirement regarding notice of termination of parole. By failing to provide written notice of the termination of Mr. Graterol Ruiz's parole, Respondents failed to comply with the statutory requirement.

The court must next determine whether this failure constitutes a violation of Mr. Graterol Ruiz's procedural due process rights. To determine the adequacy and validity of process in civil confinement, courts use the balancing test articulated by *Matthews v. Eldridge*, 424 U.S. 319 (1976). *See Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020); *Savane Francis*, 801 F. Supp. 3d 483, 493 (S.D.N.Y. 2025). After a petitioner has identified a property or liberty interest, the court must determine whether constitutionally sufficient process has been provided. *Id.* at 332–33. This determination is made using the three-factor balancing test provided in *Mathews*: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function

involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

The liberty interest at stake is the "freedom from imprisonment." *Zadvydas*, 533 U.S. at 690; *Velasco Lopez*, 978 F.3d at 851 ("Case after case instructs us that in this country liberty is the norm and detention is the carefully limited exception." (citation modified)). The court recognizes Mr. Graterol Ruiz's liberty interest in his release.

The second factor, "the risk of erroneous deprivation of such [private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," also weighs in Mr. Graterol Ruiz's favor. *Mathews*, 424 U.S. at 335. "At this stage in the analysis, the primary interest is of the detained individual, not the Government." *Portillo Vasquez v. Turek*, No. 2:25-cv-741, 2025 WL 2733631 (D. Vt. Sep. 25, 2025) (citing *Velasco Lopez*, 978 F.3d at 852). Mr. Graterol Ruiz was afforded no process when he was detained. He was not given written notice, nor was he given any individualized determination before being detained.

The third *Matthews* factor considers the burden to the Government. *Mathews*, 424 U.S. at 335. "Respondents have a 'weighty interest in the efficient administration of the immigrations laws at the border.'" *Savane*, 801 F. Supp. 3d at 494 (quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)). Respondents, however, are "not overly burdened by affording [Petitioner], at minimum, written notice as required under 8 C.F.R. § 212.5(e)(2)(f) because Respondents are required to follow their own regulations." *Id.* (citation modified).

Numerous district courts have found that written notice alone is not sufficient process when terminating a noncitizen's parole. *Meta Velasquez v. Kursdorfer*, 794 F. Supp. 3d 128, 146 (W.D.N.Y. 2025); *Y-Z-L-H v. Bostock*, 792 F. Supp. 3d 1123, 1138 (D. Or. July 9, 2025); *Savane*, 801 F. Supp. 3d at 492–93; *Orellana v. Francis*, No. 25-cv-04212 (OEM), 2025 WL 2402780

(E.D.N.Y. Aug. 19, 2025), *on reconsideration in part*, No. 25-cv-04212 (OEM), 2025 WL 2822640 (E.D.N.Y. Oct. 3, 2025). One district court, following the language in Section 1182, reasoned that to "revoke parole . . . a DHS official with authority must decide either that 'the purpose for which parole was authorized' has been 'accomplish[ed]' or that 'neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen]' in the United States." *Meta Velasquez*, 794 F. Supp. 3d at 145. This could only be accomplished via an individualized determination. *Id.* at 146.

The case here does not require the court to make that finding. Mr. Graterol Ruiz was not afforded the minimum due process as required by the statute and regulations.

For the foregoing reasons, the court GRANTS Mr. Graterol Ruiz's Petition to the extent it seeks relief under the Fifth Amendment's Due Process Clause concerning the lack of notice and administrative review.

## CONCLUSION

Petitioner's petition for writ of habeas corpus is GRANTED. (Doc. 1.) The court orders Petitioner's release from custody immediately. Respondents should report to the court by 7:00 p.m. on February 20, 2026 that Petitioner has been released. Given his serious medical needs, the court expects the medical providers at Northwest to provide Petitioner with a sufficient supply of necessary medication to allow him time to reconnect with his medical providers and obtain additional medication. When Respondents notify the court of Petitioner's release, they should include confirmation that Petitioner was provided the medications.

DATED at Rutland, in the District of Vermont, this 20th day of February 2026.

Mary Kay Lanthier
United States District Court